*515 After advisement, the foilwing opinions were delivered :
By Mr. Justice Bronson.
Within the two and a half centuries which have elapsed since the legislature first came to the aid of the courts for the suppression of frauds against creditors, there has never been a time when this transaction could stand the test of a judicial investigation. The badges of fraud attending and following the sale are plain and decisive, and the respondents, who are judgment creditors of Stoddard, are well entitled to the relief which has been granted by the court of chancery.
1. The assignment was made “for and towards,” and not in satisfaction of the debt. The appellants allege in their answer that it was taken in satisfaction ; but this is a new gloss put upon the transaction when they were Called into court—it is not the language of the written contract.
2. It was a sale of all Stoddard’s property ; and the value of the property was nearly double the amount of the debt of the appellants, Thurber & Townsend. The goods included in the assignment amounted to $435.89, and the debts, excluding all that were either “ bad” or “ doubtful,” to $878.43—making in all $1334.32. The debt on account of which the sale was made was only $675. The appellants are merchants ; they agreed on the value of the goods at the time the assignment was executed, and they cannot now change the character of the transaction by urging that they got only the remnant of a country store. And besides, nothing but argument is offered j there is not a word of proof that the goods were not of the full value agreed upon by the parties at the time. We are not at liberty to speculate in such a case, but must decide according to the pleadings and proofs. Without going any further, we have here sufficient evidence of a secret trust between the parties, injurious to third persons. The sale was absolute ; the property greatly exceeded in value the amount of the debt, and no provision was made for other creditors. Thurber & Townsend might legally secure a preference to themselves, but they had no right to go beyond that, and stand in the way of others. The assignment was direct *516 ly calculated to hinder, delay and defraud creditors, and was void within the express words of the statute.
3. The sale was made pending a suit brought by the respondents for the collection of their debt. The vendees knew before the sale that the respondents were creditors of Stoddard, and they do not deny that they knew of the pendency of the respondents’ action before the assignment was executed.
4. There was no change of possession. The property remained in the hands and under the control of the vendor, and he was permitted to act as owner as fully after the sale as he had done before ; and what is very remarkable, no explanation whatever of this cogent evidence of fraud is attempted in the answer. What we heard on the argument about the probability of bad roads on the 8th day of March, when the assignment was executed, was a matter of argument only ; the appellants have offered no such excuse in their sworn answer. Continued possession in the vendor after an absolute, sale of goods, when wholly unexplained, has always been held, not only prima facie but conclusive evidence of fraud as against creditors and purchasers. There is no case to the contrary in the books.
But it is said that the vendees made the vendor their agent, and that the possession of the agent is the possession of the principal. This is not a new device to get round the statute ; but if it succeed, this will be a new and most fortunate era for fraudulent debtors. They can place their goods beyond the reach of creditors and still retain the beneficial enjoyment, provided the friend who takes the transfer will declare the vendor his agent. Such an attempt to cheat the law cannot succeed. In Sands v. Codwise, 4 Johns. R. 593, the question related to real estate, where possession is much less important than it is in relation to personal property. Yet this court thought it strong evidence of fraud that the grantor continued after the sale to exercise acts of ownership by selling and leasing lots. The remark of Kent, Ch. J. in that case, in relation to the allegation that the vendor acted as the agent of the vendee, is not wholly inappropriate in the case at bar. “ The attempt to screen these constant, essential and con- *517 elusive acts of ownership, under the authority of an agent, is a shallow artifice, destitute even of the merit of plausibility.” There must be an actual and substantial change of possession ; a divided enjoyment, which leaves the vendor toappear to the world as owner, will not answer. In Paget v. Perchard, 1 Esp. R. 205, the plaintiffs, on taking a bill of sale of a Mrs. Spencer, who kept a public house, put a third person in possession. But it appearing in evidence that the vendor had been permitted to sell liquor in the usual way of her trade, Lord Kenyon held the sale void as against creditors, and nonsuited the plaintiffs. In Wordall v. Smith, 1 Camp. 332, the assignee put a servant in possession, but the assignor still continued to carry on the business. Lord Ellenborough said, it was a mere mockery to put in another person to take possession jointly with the former owner of the goods. He added, that,a concurrent possession with the assignor is colorable. There must be an exclusive possession under the assignment, or it isffraudulent and void as against creditors. These decisions were made under the statute 13 Eliz. ch. 5, which we long since enacted. But we have now a new additional provision on this subject, which ought to be conclusive with those whose business it is to administer, not to make the laws. Our present statute requires, in terms, an “ immediate delivery” and an 66 actual and continued change of possession” of the thing sold. Until this law is repealed, we are not at liberty to say that a mere constructive possession in the vendee^ and especially one which leaves the vendor to act as owner,will defeat the claims of a bona fide creditor.
5. The property was not only left in the possession of the vendor, and he permitted to act as owner, but there was a secret trust between the parties, or one not appearing on the face of the assignment, that the vendor should have the possession, and derive a personal benefit from the enjoyment of the property. The answer states that Stoddard was to act as agent for the vendees and to receive a fair compensation for his services. He acted a little more than three months, and during that time sold goods and collected debts to the amount of only $122 ; a sum *518 which could not be more than “ a fair compensation for his services.” Practically this was a trust that Stoddard should continue to carry on the business as usual, and put the money in his own pocket.
This transaction exhibits nearly all the signs and marks of fraud which are mentioned in Twynis case, as well as a disregard of the important advice given by Lord Coke on that occasion as to the proper mode of taking a gift or conveyance in satisfaction of a debt. 3 Coke, 80.
I have noticed several objections to the validity of this transfer, because they were presented by the case, and I was not at liberty to pass them by. But I desire to examine the transaction a little further, on the single ground that there was no change of possession.
This is not a mortgage; it is an absolute bill of sale, and continued possession in the vendor is utterly inconsistent with the deed. There was nothing in the nature or situation of the property, or the circumstances of the parties, to prevent an immediate change of the apparent ownership. In such cases it has been held, with great uniformity, both in this country and in England, that the sale is fraudulent and void as against creditors. In Twyne’s case, 3 Coke, 80, which arose soon after the passing of the statute 13 Eliz. it was one of the principal badges of fraud, that the donor continued in possession and used the goods as his" own; and Lord Coke, in his advice to the donee says : u Presently after the gift, take possession of the goods, for continuance of possession in the donor is a sign of trust.” In Bucknal v. Roiston, Prec. in Ch. 287, Sir Edward Nor they said, it had been ruled forty times in his experience at Guildhall, that if a man sold goods and still continued in possession as visible owner of them, such sale was fraudulent and void as to creditors, and that the law had always been so holden. The same thing was held by Lords Kenyon and Ellenborough, in the cases already cited, and was solemnly adjudged by the king’s bench, in Edwards v. Harben, 2 T. R. 585, where Butter, J. declared the unanimous opinion of all the judges, that unless possession *519 accompanies and follows the deed, it is fraudulent and void. He said the principle never admitted of any serious doubt.
In Hamilton v. Russell, 1 Crunch, 310, the supreme court of the United States laid down the same doctrine. Marshall, Ch. J. said, that fraudulent conveyances, which are made to secure to a debtor a beneficial interest, while his property is protected from creditors, will be most effectually prevented, by declaring that an absolute bill of sale is itself a fraud, unless possession accompanies and follows the deed. Such was also the opinion of Tilghman, Ch. J. in Dawes v. Coke, 4 Binn. 265. This rule was somewhat extended in Sturtevant v. Ballard, 9 Johns. R. 337, and applied to a case where there was an agreement in the bill of sale that the vendor should have possession for three months. The enjoyment by the vendor was not inconsistent with the face of the deed ; but Kent, Ch. J. said, “ Delivery of possession is so much of the essence of the sale of chattels, that an agreement to permit the vendor to keep possession, is an extraordinary exception to the usual course of dealing, and requires a satisfactory explanation.” The sale was declared void.
The cases in which it has been held that possession in the vendor did not necessarily render the sale void as against creditors, depended upon special and peculiar circumstances. Many of them are collected in a note of the learned reporter to the case of Bissel v. Hopkins, 3 Cowen, 189. They are cases of mortgages and conditional sales, where possession in the vendor was consistent with the deed, or where there were special and satisfactory reasons growing out of the nature and situation of the property, or the circumstances of the parties, for omitting to change the apparent ownership. They do not conflict with the general rule that an absolute sale without a change of possession, cannot be upheld where creditors are concerned.
The distinction taken by the courts between absolute and conditional sales, only served to change the mode in which fraudulent debtors attempted to place their property beyond the reach of creditors, while they still retained the beneficial enjoyment 3 and mortgages took the place of absolute bills of sale. These *520 were sometimes upheld and sometimes they were overthrown ; in some of the cases it was said that fraud- was a question of law for the court; in others, that it was a question of fact for the jury. Some judges were of opinion that continued possession in the mortgagor was only prima facie evidence of fraud, while others thought it well nigh conclusive. This state of things rendered the chances about equal that a fraudulent debtor, after all means of coercion by imprisonment were abolished, might set his creditors at defiance with impunity. For these evils a remedy was most wisely, and I think successfully, attempted in the late revision of the laws. The legislature not only re-enacted the statute of 13 Eliz. ch. 5, declaring void all conveyances made with the intent to hinder, delay or defraud creditors, 2 R. S. 137, § 1, but they made an entirely new provision, covering the whole ground of controversy. 2 R. S. 136, § 5. This section abolishes all distinction between mortgages and absolute sales, and places them both on the same footing. It then declares that the sale or assignment, unless accompanied by an immediate delivery, and followed by an actual and continued change of possession, shall be presumed fraudulent and void as against the creditors of the vendor. This presumption becomes conclusive evidence of fraud, if the vendee cannot make it appear that the sale or assignment was made in good faith and without any intent to defraud.
Notwithstanding this new and very explicit enactment, the courts have been strongly pressed to go back to the law of personal mortgages, as it stood previous to the year 1830 •, but they have steadily followed the plain and practical rule given by the statute, and held that there must in all cases be a change of possession, unless there be something in the circumstances of the case rendering the change impracticable. This construction, if indeed there be any such thing as construction where the language is unequivocal, is fortified by the seventh section, which expressly exempts from the operation of the rule contracts of bottomry or respondentia, and assignments and hypothecations of vessels, and goods at sea, or in foreign ports. These excep *521 tions go very far to prove the extent of the rule which the legislature intended to establish by the fifth section.
Nothing can take a case out of the operation of this statute, p unless the attempted explanation relate to the possession of the Í property. Although the sale be made openly before witnesses, and upon good and sufficient consideration, the answer of the statute is, unless there be a change of possession, the sale shall be presumed fraudulent and void as against creditors. The statute means as much as this, or it means nothing. Any other interpretation blots out the fifth section, and leaves us upon the re-enactment of the statute 18 Eliz. ch. 5. I need not refer to the cases on this subject since 1830. It is sufficient to say, that it is fully settled, so far as the repeated and uniform decisions of ( the supreme court can settle any question, that there must in all cases, when practicable, be a change of possession, or the transaction cannot stand. Nothing short of such a rule can effectually reach the evil against which the statute was directed; and that rule, as I have elsewhere had occasion to remark, is one of a most salutary tendency. Those who have been most conversant with courts of justice, must, I think, agree in this opinion, and will, I trust, be among the last who will consent to abandon the act of 1830. But it belongs to others to say whether the statute shall be repealed, and I will not trespass upon their jurisdiction.
I am of opinion that the decree of the chancellor should be affirmed.
By Mr. Justice Coweh.
Butler, McDonough & Co. of Utica, being creditors of Simeon Stoddard, of Lowville, brought their suit against him in January, 1834, and recovered judgment in May term, for about $700, upon which fi. fa. was issued which was returned nulla bona. Pending the suit, on the 8th of March, Stoddard, by bill of sale of that date, sold and assigned all his goods and choses in action, with some trifling exceptions, to Thurber & Townsend, of Utica, which sale and assignment were expressed in the bill to be towards payment and satisfaction *522 of a debt of $675. On the 18th June, Butler, McDonough & Co. filed their bill to set aside the sale. It is alleged by the bill, admitted by the answer, and established by evidence, that there was no actual change of possession, either as to the goods, or the notes, accounts, or other choses in action, until several months after the execution of the assignment. Upon such a state of facts, it cannot be denied that the sale and assignment wer e prima facie fraudulent and void in respect to the complainants and Stoddard’s other creditors ; nor that, in the language of the statute, such possession of Stoddard u shall be conclusive evidence of fraud, unless it shall be made to appear on the part of the persons claiming under such sale and assignment, that the same was made in good faith, and without any intent to defraud such creditors.” 2 R. S. 70, § 5, 2d ed.
Thurher and Townsend claim that they have established good faith, as the statute requires, by the facts set up in their joint answer with Stoddard. These are : That their claim of $675 was honestly due, and that Thurber took the bill of sale to himsélf and partner in satisfaction, being informed at the time that Butler, McDonough & Co. had brought their action ; that they left the goods, &c. in possession of Stoddard, as their agent, to sell and collect, &c. and agreed to pay him a fair compensation for his services. That he continued to act as such agent, from the 8th of March till the 13th of June, just before the bill was filed against them, when they took the undisposed residue of the goods, notes and accounts into their own possession. That the goods were, at the time of sale, put down in the inventory at $435.89, being the cost price, and were correctly estimated j though they believed they should not be able to dispose of them at such price. That the debts assigned amounted to $1209.33 j but they were unable to state what portion might be -made available ; that in the course of about three months, Stoddard sold goods to about 77 dollars, and received on notes and accounts and for goods sold, 122 dollars. All fraudulent intent was denied, and they admit they knew Stoddard to be insolvent.
It was agreed by the counsel for the appellants, and in this *523 n n r i ,i , • i , t ... • ,i. _ unused in auLiuii iu me putssestiiun ¡mu unuer me uuuuui ui mis j debtor after he had absolutely sold them. Several cases were/ read which deny that they can be arbitrarily left, or upon con-', sideration of the vendor’s own convenience or necessity. For/ this there are two reasons, one, that such an act is out of the1, ordinary course of business; and another, that it adds little to the security of the creditor, it being still in the debtor’s power / either secretly to convert the goods to his own use, or sell them to a bona fide purchaser, and use the avails, thus throwing the creditor back upon the same imperfect personal security, to which hardly anything can be added without an immediate change of possession. The matter is still worse where the debtor is allowed to retain the goods for the express purpose of selling them, and receiving the avails, under an agreement that he shall account for the money. The debtor openly keeps the property, sells it, and puts the money in his pocket, leaving the creditor to sue his insolvent depository, precisely as before the original debt. It was said in argument, that the goods could not well be removed to Utica, as the travelling in the month of March was probably ’ bad. The sworn answer does not give that reason. Had it been so, and there was no other place of deposit nor salesman at Lowville, it might have formed a reasonable excuse for a few days. No difficulty of that kind existed when it was found, in June, that this bill was to be filed ; and yet probably the roads were settled some time before. Nor is it said that this 400 or 500 dollars worth of goods could not as well, and certainly with much more safety to Thurber and Townsend, the creditors, have been deposited, and sold, if there was a necessity for such sale at Lowville, by some responsible person ; and that too, in the language of the answer, for “ a fair compensation.”
The same remarks are, in a great measure, applicable to the choses in action. All are left with a man entirely irresponsible, either for the money actually collected, or for losses through care *524 lessness or fraud. It is said the claims were numerous, of small amounts, the debtors scattered in their residences, and Stoddard, from his acquaintance with them, better able than any other person to promote either voluntary or forced collections. All this might have been so. It is taken up as but matter of conjecture; and we are still left to suppose that there might have been other men of business at Lowville possessing nearly the same advantages. If the transaction were honest, a little information from Stoddard would have supplied every deficiency in a neighboring agent probably more efficient, and certainly more responsible. No attempt was made to find other depositories or other agents. Stoddard continued in possession some three months, when all the choses in action, as well as the goods, were taken into the actual possession of Thurber and Townsend.
No commissions, no specific compensation for Stoddard’s services were stipulated. He was left to keep his own accounts, and made his own deductions for expenses. Nor were the goods, &c. received in satisfaction, if we are to take the written recital in the bill of sale as evidence. That states the assignment to have been for and towards the discharge of the debt. The legal effect would be only to discharge so much of the debt as Stoddard should pay over; and as between him and his vendees, the expressed purpose could not easily be contradicted.
It was said in argument that the possession was changed to the vendees, within the legal rule, that the possession of the agent is that of the principal. This would be to contradict by construction the words of the statute, which demands an actual change. The possession of every vendor after sale is constructively the possession of the vendee; and, at least, the argument furnishes an answer, to the evidence of fraud, which can always be raised, by the parties clothing the possession with a contract of agency.
Taking the history of this transaction from the answer itself it appears to me there is an air of looseness, generality and contradiction about it, at war with the idea that the parties were using Stoddard’s means in good faith, and with an honest view *525 to the rights of his other creditors. I think they should at least be put to show so much, in order to overcome the stern inference of fraud which the law raises against them. The strength of the presumption is measured by the adjudged cases, the result of which was well expressed by Mr. Justice Bronson in Randall v. Cook, 17 Wendell, 56 : " Where the property is of such a nature that there may be an immediate change of possession that change must be made, or the law will pronounce the transaction fraudulent as against creditors and subsequent purchasers.” I have sought in vain, through this answer, for materials which would take the case out of the rule thus laid down. It is true, the answer negatives generally all intent to defraud ; but the denial stands by the side of an admitted specific fact, which, being unexplained, the law has in terms declared incompatible with such a denial.
The defendants produced no witnesses, although their answer was put in issue by a replication, and proofs were taken on the part of the plaintiffs. By these, it appears pretty satisfactorily that the available debts assigned were not far from $900 in gross amount, which, added to the goods as valued by both Thurber and Stoddard, $435 • 89, make an aggregate of nearly double the debt they were assigned to satisfy. It is said the price of goods, as fixed by the schedule, is not conclusive. I should, however, think it very indiscreet in this court to conclude against it. Mr. Thurber was a merchant, valued the goods at cost, and swears in his answer that they were correctly valued : so do the other defendants; and this derives confirmation from the witnesses who were examined on the part of the complainants. All is sought to be overturned by the general fact, that they were u the remnant of a country store.” We are asked, with emphasis, what merchant would not rather have cash for his debt 1 To answer the question, we are brought back to the value of the remnant, which is abundantly established by the best evidence ; and no one can deny that it is possible for a remnant to be of the value admitted by the parties on oath.
The expenses of collecting the debts were neither averred in *526 the answers nor established by other proof. In addition to Stoddard’s conceded insolvency, it appears he was dependent for a livelihood on the business which he had nominally transferred, and, added to his own, were the necessities of his family. He might very naturally infer that Thurber and Townsend would have no objection to his retaining the excess beyond their debt; and he was left to regulate that according to the dictates of his own conscience ; for they could enforce no collection against him. The offer of Thurber and Townsend, after being threatened with a suit, to surrender the fund on being paid their own debt, was accompanied with the alarming general addition that the expenses they had incurred should also be paid. If such a proposition in any shape were admissible to defeat a right of suit already attached, it could not but be known that the expenses incurred by an agency such as this, might seriously detract from the value of the fund. The surprise is rather that they should have refused to take the goods at their own valuation, with the money already collected, and allow the balance to be managed by persons so deeply interested as the complainants, in making the best of it for the benefit of all concerned.
Admitting that the debt due to Thurber and Townsend is correctly stated in the bill of sale, and that the agency of Stoddard was publicly known, (though there is but faint evidence of the latter,) yet these are slight circumstances when weighed against those of an opposite tendency. Altogether, so far from establishing good faith in the purchase of. these goods and choses in action, to my mind the presumption of fraud, arising from Stoddard’s possession after the sale, is considerably strengthened by other facts in the case.
My conclusion is, therefore, that the decree of the chancellor should be affirmed.
By Senator Dickinson.
In this cause two leading questions are presented : First. Was the transaction between Thurber and Townsend and Stoddard fraudulent in fact, designed to hinder, delay and defraud creditors 1 Second. Was it such a transac *527 tion as the law declares fraudulent,' however honest the intention of the parties 1 The stating part of the bill filed before the vice chancellor is sufficiently comprehensive to justify the special interrogatories under it. The defendants were required to answer upon oath : and such parts of their answer as are responsive to the bill, in the absence of contradictory proof, must be taken as conclusive evidence. We may then regard the honesty and fairness of the transfer as fully established, for the appellants in their answer severally deny all fraudulent intention and, every secret trust.
It is insisted by the respondents that the amount of property transferred by Stoddard to Thurber & Townsend was so grossly disproportioned to the amount of their debt, as to be strong, if not conclusive evidence of fraud, and if we are confined to the mere footings of the figures without looking at the items, the position would seem to be a true one. No principle is better settled than that a debtor, in failing circumstances has a right to prefer one creditor over another ; but he cannot convey or place beyond the reach of others, more property than is reasonably sufficient to pay the debt so preferred. But in the application <of this rule we should, have regard to the real and not the nominal value of the property transferred. The property transferred to Thurber & Townsend by Stoddard was, as appears from all the evidence, the winding up of a very miserable concern. The inventory of goods presents the mere leavings of what was once called an assortment, the merest refuse of a country store, amounting, it is true, at fair cost prices, to $435.89. But what merchant ever sold or expected to sell his entire lot of remnants at cost 1 The transferred debts amounted in the whole to $1,219.28. Of this amount $681.05 were estimated good, $197.38 collectable, $96.37 doubtful, and $234.53 bad. The debt of Thurber & Townsend, to be paid from these goods and debts and fifty dollars cash, was $725. Whoever has had occasion to wind up a concern of this kind, needs not to be reminded that after deducting the inroads upon his schedule from removals, set-offs, insolvencies, costs of litigation and time and expenses, *528 he will not unfrequently find it a hard bargain even if he had received the whole as a gratuity. But in this case we are not left to mere speculation as to the value of the transferred property. It is admitted by the stipulation of the parties, that before the bill was filed, Thurber and Townsend offered to give up to the respondent all the property and debts they received by the assignment from Stoddard, upon payment of their debt against Stoddard and expenses of taking the property. This offer the respondents refused to comply with, thereby giving their jtidgment of the value of this property. The respondents allege in their bill of complaint, that the value of the property transferred by Stoddard to Thurber & Townsend is so far dis-proportioned to their debt against him, that it is evidence of fraudulent intent in the transfer. They ask this court to believe that which, it is very evident, they did not believe themselves. If,, as they pretend, the property had been worth enough to pay both debts, or of any considerable value over and above the amount of the debt of Thurber & Townsend, they would have availed themselves of this offer, and not have entered a court of chancery for the mere purpose of vindicating justice. Besides, they would have framed their bill, which they have not done, so as to have, in any event, reached the surplus, after paying the debt of Thurber & Townsend, if they had supposed it was worth preserving. I am therefore clearly of the opinion that the transaction was honest and fair, and without intent to defraud 3- and that the value of the goods and debts was no greater than was reasonably sufficient to secure, and ultimately pay the debt for which they were pledged.
The question then, which is presented, is one of much interest in the history of our jurisprudence. It early engaged the attention of the courts of England, and has been most fully reviewed in this and in most of the states of the union. The diversity of opinion entertained, not only by the profession but by learned judges, and the supposed contradictory position of authorities,would seem to justify a review of all the leading cases 3 and I apprehend xve shall find less conflict of authority than has gene *529 rally been supposed j nor has the doctrine been changed, but is now substantially as it always has been since the law of the twelve tables of Rome.
The common law of England upon this subject was based upon the civil law ; and the statutes of 13 and 27 Elizabeth, the first of which referred to creditors and the other to purchasers, were but declaratory of the common law. The same has been held the common law in this country, and the statutes of Elizabeth were substantially re-enacted here, and with trifling variations$ have found their way into our Revised Statutés.
The earliest adjudged case which arose upon the subject of fraudulent assignments was Twyne's case, 3 Co. 80. This was a criminal proceeding in the star chamber, against Twyne, under the statute of 13 Elizabeth, for making and publishing a fraudulent gift of goods. One Pierce, being indebted to Twyne and also to C., the latter brought a suit against Pierce to recover his debt, pending which suit Pierce made a secret deed of gift of all his goods and chattels, real and personal, to Twyne, notwithstanding which Pierce 11 continued in possession of the goods and some of them he sold, and he shore the sheep and marked them with his own mark.” C. prosecuted his suit to judgment and execution j and the question was, whether the deed from Pierce to Twyne was fraudulent and of no effect. 66 And it was resolved by Sir T. Anderson, keeper of the great seal, and the whole court of star chamber, that the deed or <£ giftf as it was called, was fraudulent: 1. For the reason that the gift was general, not excepting his apparel or any thing of necessity. 2. The donor remained in possession, and used them as his own, and traded and trafficked with others. 3. It was made in secret. 4. It was pending the suit. 5. The donor’s possession was evidence of a fraudulent trust. 6. The deed contains that the gift was made honestly, truly and bona fide. This case seems to have been decided upon the ground that the possession of Pierce, treating the property as his own, and trading and trafficking therein, was evidence of a secret, fraudulent trust. This, the court say, is evidence of an agreement that the ££ donee should deal favorably *530 with him in regard to his poor estate”—that it shall not be called bona fide} because it was a sign of trust.
In the case of Paucefoot, who being indicted for recusancy for not coming to divine service, with intent to defeat the queen of what might accrue to her, made a gift of all his goods, for a feigned consideration, and after grave deliberation by, all the barons in the exchequer chamber, this conveyance was held to be void.
In the case of Stowe v. Grubham, 2 Buls, decided by Lord Coke previous to 1656, a distinction was taken between an absolute and a conditional sale, his lordship saying, “ when the conveyance is conditional, continuance in possesion after this shall not be said to be fraudulent, and this is very clear.” But in Ryal v. Rollee, 1 Atk. 165. Mr. Justice Burnet, in construing the statute of 13 Eliz. says, " there is no distinction between sales absolute and conditional; courts of equity and juries are to consider upon the whole evidence, whether the conveyance was made with a view to defraud or notand he adds, ££ when the goods or deeds have been left with the vendor so notoriously that there could be no design to defraud, this' has never been looked upon as fraudulent.”
In Cadogan v. Kennett, 2 Cowp. 435, Lord Mansfield says, "A fair voluntary conveyance may be good against creditors, notwithstanding it is voluntary. The circumstance of a man’s being indebted at the time of his making a voluntary conveyance, is an argument of fraud. The question, therefore, in every case is, whether the act done is a bona fide transaction, or whether it is a trick and contrivance to defeat creditors. The statute ought not to be so construed as to make innocent parties suffer.”
In Leonard v. Baker, 1 Maule & Sel. 255, it was held, that ££ as the assignment was notorious in the neighborhood, and the creditor claiming had notice of it, it was not void.”
In Watkins v. Birch, 4 Taunt. 823, Lord Mansfield says, “ Can we say that a person who has bought goods under an execution may not let them to the former owner of them 1 No case has gone so far as that.”
*531 Mr. Shepherd, in his Touchstone, p. 65, commenting upon the statute of Elizabeth, and speaking of deeds of conveyance, says, “ All such as are made bona -fide and upon good consideration, are not to be accounted fraudulent by this statute. But if, hanging a suit, a deed is secretly made and the vendor continues in possession, it is void.”
Starkie, in his Treatise upon Evidence, says,When fraud may he collected from the instrument itself, or from the deed coupled with extrinsic circumstances and the situation of the parties, it is a question of law arising from the facts so found ; but when it depends upon intention, the existence of that intention must be found by the jury. 2 Starkie’s Ev. 616, 617, part 4.
In Kidd v. Rawlinson, 2 Bos. & Pul. 58, Kidd bid off Auburn’s goods at sheriff’s sale, and left them with him. Lord Eldon said, <( If Kidd had lent money to Auburn to buy these goods, and had then taken a conveyance of them as security for his debt arising out of the mere act of lending the money, leaving Auburn in possession of the goods, would not have been a fraudulent act.” And Buller, in his Law of Nisi Prius, 258, says, “ But yet the donor continuing in possession is not in all cases a work of fraud, as where a donee lends his donor money to buy goods, and at the same time takes a bill of sale of them for securing the money.”
But the case of Edwards v. Harben, 2 T. R. 587, decided in the court of king’s bench, in the reign of George III. seems.to have been invoked as authority for almost every variety of decision upon this subject. This decision has been seriously questioned, both in the court where it was pronounced, and in this country :, but if we except the distinction it takes between sales absolute and conditional, I am unable to discover any thing in the opinion of the court inconsistent with the plainest principles of justice and law. The case has been misunderstood, as well by those who have arraigned it, because of its extraordinary rigor, as by those who have claimed its authority for a principle which it does not contain. It presents the following facts : Mercer was indebted to Edwards, the plaintiff, in the sum of £22 18s. 6d., *532 and also to Harben, the defendant, in the sum of £191. On the 27th March, 1786, Mercer gave to Harben a bill of sale of all his goods, &c. in his house at Lewes, specifying the articles. The bill of sale was absolute on its face, but there was a verbal agreement that Harben might take the goods and sell them at the end of fourteen days, refunding the surplus money. The goods were left with Mercer, but one cork screw was delivered in the name of the whole. The goods remained in the possession of Mercer until his death, which took place 7th April, 1786, and on the day following, Harben entered and took' possession of thé goods, and sold them under his bill of sale. Edwards prosecuted him as executor in his own wrong. At nisi prius, a verdict was rendered for Edwards, subject to the opinion of the court. In pronouncing the opinion of the court, Butter, Justice, cites the case of Bamber v. Baron, decided by the same court at a previous term, but which was touching an assignment made for the benefit of such creditors as would sign a deed of composition within a certain time ; and says, “ In that case, the court were unanimously of opinion that unless the possession accompanies and follows the deed, it was fraudulent and void.” But in pronouncing the judgment of the court in the case then at bar, he cites the case of Stone v. Grubham, with approbation, and says, “The court there held, that an absolute conveyance or gift of a lease for years, unattended with possession, was fraudulent, but if the deed or conveyance be conditional, then the vendor’s continuing in possession does not avoid it, because by the1 terms of the conveyance, the vendee is not to have possession till he has performed the condition. Now, here, the bill of sale was on the face of it absolute, and to take place immediately, and the possession was not delivered, and that case makes the distinction between deeds or bills of sale which are to take place immediately, and those which are to take place at some future time. For in the latter case, the possession continuing in the vendor till that future time, or till that condition is performed, is consistent with the deed, and such possession comes within the rule as accompanying and following the deed.” And he adds that which *533 I trust no one is disposed to controvert: “ This cause has been argued by the defendant’s counsel, as being a case in which the want of possession is only evidence of fraud, and that it was not such a circumstance per se, as makes the transaction fraudulent in law; that is the point which we have considered, and we are all of opinion that if there is nothing but the absolute conveyance without the possession, that in point of law is fraudulent.”
The late Chancellor Kent, in his commentaries upon the English cases, 2 Kent’s Comm. 520,says, “ The conclusion from the recent English cases would seem to be that though a continuance in possession by the vendor or mortgagor, be prima facie a badge of fraud, yet the presumption may be rebutted by explanations, showing the transaction to be fair and honest, and giving a reasonable account of the retention of possession. The question of fraud, in such cases, is not an absolute inference of law, but one of fact for a jury.”
In the case of Hamilton v. Russel, 1 Cranch, 310, decided in the supreme court of the United States, Robert Hamilton executed to his brother, Thomas Hamilton, 4th January, 1800, an absolute bill of sale of a slave ; Robert Hamilton continuing in possession. Russel, a judgment creditor of Robert Hamilton, caused the slave to be taken in execution in July 1801, and was prosecuted by Thomas Hamilton, who claimed the slave under the bill of sale. No excuse or explanation whatever was given or attempted, and the jury very properly returned a verdict for the defendant. In pronouncing the decision of the court upon a motion for a new trial, the chief justice reviews the leading English cases, adopts the reasoning of Buller J. in Edwards, v. Harben, and concludes by saying, “ this court is of the same opinion. We think the intent of the statute is best promoted by that construction ; and that fraudulent conveyances, which are made to secure to a debtor a beneficial interest while his property is protected from creditors, will bejnore effectually prevented, by declaring that an absolute bill of sale is of itself a fraud, unless possession accompanies and follows the deed.” The statute of Virginia construed in this case was the same as the statutes of *534 13 and 27 Elizabeth; and with the exception of the artificial distinction taken by the court between absolute and conditional sales, which, if it ever existed, has been abolished by the Revised Statutes, the conclusion of the court is in accordance with the principles for which I contend. I admit, most fully, that where there is u nothing but the absolute conveyance without the possession, that, in point of law, is fraudulentand also, that “ fraudulent conveyances which aremade to secure to a debtor a beneficial interest, while his property is protected from creditors,is of itself a fraud,” whether the possession accompany the deed or not. A bill of sale, whether absolute or conditional, intended to secure to the debtor a beneficial interest, and protect his property from creditors, is clearly fraudulent ; nor will the fact that the possession accompanies the deed make it honest and bona fide.
In Phetteplace v. Sayly, 4 Mason, 321, Justice Story says, where a party, who is owner, sells personal property absolutely, and yet continues to retain the visible and exclusive possession, the law decrees such conduct a constructive fraud upon the public. To be fraudulent in law, it must be such a transaction as is necessarily at war with good intentions and against good faith.” But here, again, the abstract proposition only is decided, whether an absolute sale of chattels is prima facie void, unless the vendee take actual possession; the question, whether the party was not at liberty to explain the reasons why the vendor continued in possession, not being presented to the court.
This doctrine has undergone a most thorough and able review in the state of Massachusetts. In the case of Brooks v. Powers, 15 Mass. R. 244, one Will sold to Brooks a yoke of oxen, continuing in possession. Powers, a creditor of Will, caused the oxen to be seized on attachment. Brooks brought trover, and obtained a verdict for the value of the oxen; and upon a motion by the defendant for a new trial, on the argument of which all the ancient and modern cases were cited, the chief justice says: 11 It has been contended in this case, that the possession of the vendor of personal chattels after the sale, is conclusive evidence in favor of creditors that the sale was fraudulent 5 or rather, that *535 it is itself a fraud. But we are all of opinion, that although it is evidence of the strongest kind, it is not conclusive. The vendee may, notwithstanding, upon proof that the sale was bona fide and for valuable consideration, and that the possession of the vendor, after such sale, was in pursuance of some agreement not inconsistent with honesty in the transaction, hold under his purchase against creditors : and so it has been often decided in this court, as well as in England.” In the same court, in the case of Bartlett v. Williams, Pick. 295, Putnam, J. says : “It is certainly a general rule, that the possession must accompany and follow the deed, and that the possesion of the vendor, after the bill of sale, wnexplained, would render the conveyance void as against creditors. But such a possession may be explained, and may be perfectly consistent with justice.”
The same doctrine has been held in New-Hampshire. In Homer v. Lane, 2 N. Hamp. R. Mr. Justice Woodbury says : “ In fine, possession of property being retained by the vendor, after a sale, is not per se fraud ; but, in the language of Lord Mansfield, being only evidence of fraud, may be explained. The whole circumstances should be submitted to the jury, and from all parts of the transaction, taken together, it should be determined whether the contract of sale was or was not fraudulent in the concoction of it.” In Coburn v. Pickerings 3 N. Hamp. R. 425, Ch. J. Richardson, in delivering the opinion of, the court, says : “ After a most attentive and careful examination of the books on this subject, we have not been able to entertain a doubt, that the true rule to be deduced from all the adjudged cases is, that where the sale is absolutes possession and use of the good afterwards by the vender is always, unexplained, conclusive evidence of a trust.” In this case all the English cases wei e cited and reviewed ; and the court, in concluding their opinion, hold, what I believe always has been, is now, and ought hereafter to be the law, viz. “ that such possession in the vendor may always be explained ; but if not explained, should be adjudged fraudulent in law.” It was further held by the same court, in Ash. v. Savage, 5 N. Hamp. R. 545, that “ where a chattel has been mortgaged, pos *536 session by the mortgagor may in some cases be evidence of fraud, but is never a fraud in law, or conclusive evidence of fraud.”
The leading cases in Connecticut seem to indicate a more rigid rule than has obtained in most of her sister states, without perhaps intending to carry the doctrine further. They recognize, and I think partially extend the case of Edwards v. Harben; but in Potter v. Smith, 5 Conn. R. 201, Ch. J. Hosmer adopts the reasoning of the supreme court of this state in the case of Sturtevant v. Ballard, 9 Johns. R. 337.
In JYorth Carolina, where this class of cases has been elaborately reviewed, it was held in the case of Vicks v. Keys, Haywood’s N. Car. R. 126, that “ The property ought to accompany and follow the deed ; but, (says Judge Taylor, in delivering the opinion of the court) I cannot agree that the property going otherwise as to its possession than the deed points out, is absolutely fraud.” In Trotter v. Howard, Hawks’ N. Car. R. 322, Judge Hall, in delivering the opinion of the court, after citing the case of Edwards v. Harben, says : The statute of Elizabeth declares that all conveyances made with intent to defraud creditors shall be void and of no effect ; and whether a conveyance comes within the operation of the statute, whether it is made with intent to defraud creditors, or not, is a question of fact, which, under all the circumstances of the case, properly belongs to a jury to decide. It is a matter of fact, and not a question of law.”
In South Carolina, in the case of Terry v. Belcher, 1 S. Car. R. 573, in speaking of the rule that possession must accompany the deed, and the difficulty and injustice of maintaining it, the court say : “ In other instances the strong arm of the law has been able to enforce the rule for a time, but even this engine becomes powerless when opposed to the will of a whole community, and the rule is only remembered for the injustice it has done; a wise lawgiver should, therefore, enquire whether the rule proposed, even to give effect to a correct principle, is calculated to promote justice and the happiness of mankind. Those who maintain the opposite side of the question, predicate their *537 argument on the facility for practising frauds through this means, and the difficulty of tracing them out; and I agree there is much truth and good sense in the argmnent. But the security is found in a jury drawn from the atmosphere of the transaction, and the suspicion of the law throws the burthen of proof upon the purchaser.” After citing a number of cases in support of this doctrine, they conclude : " It is the voice of mankind, repudiating a policy at war with their feelings, and one which courts of justice must respect.” The same doctrine was most emphatically maintained in the case of Smith v. Henry 2, Bailey's S. Car. R. 119, the court saying, ££ the jury ought to be charged that possession in the vendor is prima facie evidence of fraud, and leave the explanation to them.”
In Tennessee, White, J. in the case of Ragan v. Kennedy, 1 Tenn. R. 100, held, " Whether there be fraud or not, the jury must determine from the evidence. The law considers various circumstances as evidence of fraud : as when a bill of sale is made secretly and not in the usual way •, where a suit is pending against the person conveying; when made by one relative to another, or when the person making it uses the property after-wards as his own, and w¿en a bill of sale on its face is absolute and is not followed by a possession of property, it is void.”
In Virginia, in the case of Alexander v. Dencale, 2 Munf. R. 341, the district judge held, that ££ an absolute conveyance of personal estate when the party making it retains possession is void as to creditors, even without other evidence of fraud; though (he says) this appears to be carrying the matter too far, and perhaps agreeable to ancient determination, it would have been better to have considered it as evidence of fraud, connected with other circumstances.” This decision was sustained and affirmed by the high court of appeals, but it should be borne in mind that there was no explanation offered or given, why the vendor retained possession. In Snyder v. Gree, 4 Leigh's R. 547, in reviewing this doctrine, the president of the court of appeals says : “ Can it be that in these various transactions, so common in the concerns of life, that the purchase is effected with constructive fraud ? *538 I think not. The mischiefs of the rule would be greater than the fraud at which it is aimed, if it be permitted to insinuate itself into such transactions as these;” and he adds : “ On either side there is an evil to be avoided, and the most common transactions of life, and the ordinary cases of personal estate will be trammelled and embarrassed, if our sole care is directed to the protection of creditors and purchasers who ought to protect themselves.”
In Kentucky, the case of Wash v. Medley, 1 Dana's R. 269, Chief Justice Robertson says : “ The fact that no visible alteration in the actual possession accompanied and followed the deed, cannot be deemed per se, fraudulent. It was a fact proper for the consideration of a jury.” In Baylor v. Smithers, 1 Little's R. 112, the court held that on an absolute bill of sale, the vendee must take possession, or it would be deemed fraudulent; but if the bill of sale was conditional, the question of fraud must be decided by the jury, from the facts of each particular case.
In Pennsylvania, the ..courts seem tc have adopted the most rigorous construction of the English rule, which is summed up by Chief Justice Tilghman, in Danus v. Cape, 4 Binney, 258, as follows : " When the deed contains an absolute immediate assignment, it is necessary that the possession should accompany and follow it, otherwise it will be fraudulent under the statute 13 Elizabeth, and, indeed, at common law; but when the deed or conveyance is conditional, or to take effect at some future time,, the retaining of the possession according to the intent of the deed is not fraudulent. ”
In the early decisions of the courts of this state, it was held, that the continuance of the vendor in possession, was only prima facie evidence of fraud, and was a circumstance which admitted of explanation. But in Sturtevant v. Ballard, 9 Johns. R. 337, it seems to be supposed that the rule contended for by the respondent in this case, has been sanctioned. This was the case of a sale by a blacksmith of his tools to a merchant, partly for cash, and partly in payment of a precedent debt; the bill of salo containing an agreement that the vendor should continue in pos *539 session of the tools three months. The tools were seized by a crditor upon execution. In the contest between the vendee and the creditor, Kent, Ch. J. says, with emphasis: “ There is no case which sanctions such a sale as the one in the present instance ; for here, no reason whatever appears for withholding delivery of possession, and the sale must, therefore be considered in judgment of law as fraudulent and void against the creditors.” And he adds, by way of conclusion, “We may, therefore, safely conclude that a voluntary sale of chattels with an agreement either in or out of the deed, that the vendor may keep possession, is, except in special cases and for special reasons, to be shown to and approved by the court, fraudulent and void as against creditors. This is clearly not one of those cases, and the defendant is, therefore, entitled to judgment.” This case, I apprehend, does not go the length which many seem to have supposed. Chief Justice Kent places the decision upon the ground that “ no reason whatever appears for withholding delivery of possession, and therefore the sale must be considered void;1' and the decision is precisely what the revised statutes now declare to be the law. He does not decide, nor assume to decide, what particular fg.cts and circumstances should be proved by way of explanation ; but he clearly admits that the possession in the vendor after sale, may be explained, for he proceeds upon the ground that “ no reason whatever” was shown in that case.
This whole doctrine passed under the able review of the late Chief Justice Savage, in the case of Bissel v. Hopkins, 3 Cowen, 166. This cause was argued at great length and with distinguished ability, and most of the ancient and modern cases were cited. The chief justice, in alluding to the opinion of the court in Sturtevant v. Ballard, says: “ The learned judge no doubt intended to say here, as in Barrow v. Paxton, 5 Johns. R. 261, that possession continuing in the vendor, is only prima facie evidence of fraud, and may be explained. The question in every case is, whether the act done is a bona fide transaction, or whether it is a trick and contrivance to defraud creditors. The possession *540 by the vendor of personal chattels, after the sale, is not conclusive evidence of fraud. The vendee may, notwithstanding, upon proof that the sale was bona fide, and for a valuable consideration, and that the possession of the vendor, after such sale, was in pursuance of some agreement not inconsistent with honesty in the transaction, hold under his purchase against creditors.” This decision has been affirmed by the decisions of the same court in Jennings v. Carter, 2 Wendell, 449, in Driver v. McLaughlin, id. 596, and in Hall v. Tuttle, 8 id. 375, in which last case the late chief justice again reviews at length the leading cases, and again declares that “ possession by the vendor after the sale, is only prima facie, and not conclusive evidence of fraud ;” and avers that no case can be found which holds a different rule. Hall v. Tuttle arose and was tried before the Revised Statutes took effect, but was argued and decided afterwards ; and the chief justice cites the provisions of the Revised Statute applicable to the question, and declares that the provisions are the same as those of the statute of 13 Elizabeth, which statute was declaratory of the common law.
In a learned note annexed to the case of Bissel v. Hopkins by the reporter, now Mr. Justice Cowen, it is said, “ The details or circumstances which shall constitute a fraud, like those of usury, or the degree of neglect which shall render a man liable in an action on the case, seem to mock the effects of a general rule, and must be ranged forever without the line which divides the province of the court from that of the jury. The law may declare that fraud shall vitiate the sale; but as the devices by which that fraud is to be compassed and disguised may be various, so the evidence by which it is to be established or repelled may frequently vary with the cases as they arise.” And, after revewing the cases at length, the reporter added, “But whichever way the decisions may tend upon the question of possession in the vender, after a voluntary, direct and absolute bill of sale, so far as the statute of Elizabeth is concerned, no doubt can be entertained at this day that a continued possession in the mortgagee of chattels, is not per se evidence, of fraud.”
*541 I have thus sought to compile all the leading ancient and modem decisions upon this subject, previous to the revised statutes, in the language of the respective courts, for the purpose of exhibiting in a condensed form, what the law has been ; and of correcting by force of authority, the belief that the courts have ever entertained a rule, which in its application must always be harsh and inequitable—or that they have attempted to overrule a principle which, in my judgment, ought to set all human authority at defiance. The supreme court in some recent decisions have, I am compelled to admit, virtually established, or sought to establish, a new and, I may add, severer rule for their government ; but whether it is sought to be maintained by the current of authority, or by some supposed new provision of the revised statutes, does not very clearly appear. I have already shewn what the law has been ; and if, as I have supposed, it has not been essentially changed by the operation of the revised statutes, it seems to me clear that the reasoning of the supreme court in the cases of Doane v. Eddy, 16 Wendell, 522, and of Randall v. Cook, 17 id. 54, (both of which are cited by the respondents’ counsel,) are not upheld by the sanction of authority. In the case of Doane v. Eddy, the case of the travelling preacher, although the mortgagee offered to prove at the trial that the mortgage was given for a valuable consideration, in good faith, and without intent to hinder, delay or defraud creditors, and offered as explanation why the mortgagor retained the possession, that he was a circuit or travelling preacher of the gospel, and that the horse, the subject of controversy, was absolutely necessary to the prosecution of his calling, yet the plaintiff was nonsuited upon the trial, and the supreme court, in a learned opinion delivered by Mr. Justice Bronson, (the Chief Justice dissenting,) refused to set aside the nonsuit, and held that the proof offered was insufficient to justify possession in the vendor, and that such evidence was, admitting all the facts proposed to be given in evidence to be true, conclusive evidence of fraud. In the case of Randall v. Cook, the only reason given by the vendee why the vendor retained possession was, that the vendor *542 wished to use the horses ; and this 66 transaction,” says Mr. Justice Bronson, “ is fraudulent inlaw—the sentence is written in the statute book, and neither courts nor juries are at liberty to disobey the mandate.” The reasons for retaining possession in this case were certainly very slight, and might perhaps be deemed unsatisfactory ; but I can well conceive of cases where even the wish to use property would justify leaving it with the vendor for that purpose, so far as to submit the question of intent to a jury. I have been unable to find any sentence in the statute book which virtually condemns without a hearing, which separates conduct from motives, for the purpose of passing judgment upon both, or which executes with its sword before it has weighed in its balances. The statute pronounces judgment only in cases where the mortgagor or vendor continues in possession without explanation. The fifth section of 2 R. S. p. 136, is as follows : “ Every sale of goods made by a vendor of goods and chattels in his possession, or under his control, and every assignment of goods and chattels by way of mortgage or security, or upon any condition whatever, unless the same be accompanied by an immediate delivery, and be followed by an actual and continued change of possession of the things sold, mortgaged or assigned, shall be presumed to be fraudulent and void as against the creditors of the vendor, or against the creditors of the person making such assignment, or subsequent purchasers in good faith; and shall be conclusive evidence of fraud, unless it shall he made to appear, on the part of the persons claiming under such sale or assignment, that the same was made in good faith, and without any intent to defraud such creditors or purchasers.” This section of the statute, I apprehend, leaves the law substantially where it found it. It places absolute and conditional sales upon the same ground, and declares possession in the vendor conclusive evidence of fraud, unless, (or rather) until explained; or in other words, it .throws the burthen of proof upon the vendee, or person claiming under such sale, to shew “ that the same was made in good faith, and without any intent to defraud creditors or purchasers.” JBut this question of intent is by no means left for *543 the decision of the court, nor is it to be regárded as disputed territory between the court and jury. The fourth section of title third of the same chapter, 2 R. S. 137, declares that u the question of fraudulent intent, in 1all cases, shall be deemed a question of fact and not of law. In addition to this clearly defined intention of the legislature as to the validity of bills of sale or chattel mortgages, when given in good faith and without any intent to defraud creditors or purchasers, it is worthy of remark that the last act passed by the colonial legislature of New-York was to provide for the registry of chattel mortgages) and that the legislature in 1833, with a view to correct abuses passed an act requiring them to be placed on file in the town where the mortgagor should reside, clearly contemplating that the goods were to remain in the possession of the mortgagor or vendor. While it is certain that the question of fraudulent intent is one of law, where the vendor retains possession and no explanation is offered ; it is equally clear that the question of intent, when an explanation is offered, is a question of fact. The former is the prerogative of the court, and the latter of the jury. It is only necessary for. the person claiming under such sale to shew “ that the same -was made in good faith, upon sufficient consideration, and without any Intent to defraudand of the intent and good faith the jury are the exclusive judges. This a sentence is written in the statute book, and courts are not at liberty to disobey its mandate.” It is undoubtedly the province of the court to pass upon the evidence offered in this as in all other cases, and no further; and when they have instructed the jury that the law pronounces the transaction fraudulent, unless they are satisfied that the evidence rebuts all presumption of fraudulent intent, they have discharged their office, and it is for the jury and not for the court to say, whether the transaction was fair and without intent to defraud. The benefits of this salutary rule.may be as effectually destroyed by its misapplication, as by refusing to acknowledge its existence. If courts are to acknowledge the abstract principle merely, and then destroy 'ts operation by laying their hands on every transaction which *544 would ordinarily come within its provisions, and thus subvert the very spirit and intention of the statute, the sooner it is abrogated entirely, the better. The statute, to my understanding, offers its protection to honesty and fair-dealing, in all cases where it is so-pronounced by the solemn verdict of a jury; but the rule will prove a delusive mockery, if courts are so to.construe the statute as to sweep away the only matter fitted for their consideration. In short, I am unable to discover what power the statute has given the court to determine what particular facts shall or shall not be sufficient evidence'of honest intention ; nor do Thesitate to declare that any facts, which impress the mind with a conviction that the sale was honest and bona fide, and was not designed as a mere trick to cover property for the purpose of defrauding creditors, should be submitted to the jury. While such evidence should be subjected to the severest scrutiny, the jury have a right to pass upon it; and if, against the presumption of law, from the explanations given, they find it honest and bona fide, their verdict ought to be conclusive.
Neither the legal nor the moral code should be administered for the sole benefit of creditors. They become creditors by their own volition, and have abundant means for their qwn protection j. nor can I consent to place the general creditor, upon a superior footing to him who furnishes his poor neighbor with a cow to nourish his children, or a team to sow his crops or gather in his-harvest. If the commercial interest of this country cannot be sustained without trampling upon all others, and the ordinary charities of life besides, the sooner it finds its level the better. It-is an idle dream to suppose we can advance the cause of morals, by establishing a rule which ministers to the mercenary passions at the expense of the benevolent affections, or that the fountain of justice will send forth purer streams if they are forced to flow through artificial channels. The principles of law are but the-enlightened and just conclusions of a moral people, pronounced by their own tribunals, and when the law seeks to erect a standard- of its own, and ceases to exert its attributes in administering to. the public good, the same hand which upholds it will not fail *545 to divest it of its power to oppress. It will then be seen, how 1 utterly unavailing is the attempt to divide honesty into chapters, or to define morality by sections. Sacred scripture has declared that the poor we shall always have with us, and charity to our fellow men is therein strongly inculcated ; but whether the doctrine under consideration is calculated to give force to this divine declaration, by compelling the affluent to retain their goods exclusively in their own possession, upon pain of forfeiture to a stranger, or to counteract its truth by making the possessor of goods,' under all circumstances, the owner, it is perhaps difficult to determine.
If this rapacious principle of law, which sets all motives and intentions at defiance, is to obtain, it should at least lay down some outlines for its own government. It ought to declare how far the owner may safely entrust his chattels from his person before the title steals from him, nolens volens,by operation of law; and for how great a period of time they may so remain out of his possession, before the title to his property will pass from him. If facts and circumstances are unavailing, and courts are to dispose of this class of cases without the intervention of a jury, a Procrustean couch should be fitted for their reception, and extension or amputation bring them to a common standard.
In Randall v. Cook, Mr. Justice Bronson says," Had it been declared fifty years ago, that if a man conveyed his personal chattels and still kept them himself under any pretence whatever, the transaction should be deemed absolutely fraudulent and void as against creditors and purchasers, it would have saved an incalculable amount of time and money which has been expended in the litigation of questions of this kind; and it would moreover have rendered a most important service to the cause of good morals, by removing all temptation to the numberless frauds which have been committed for the purpose of placing property beyond the reach of legal process.” While I acknowledge the force of reasoning adopted by the learned and esteemed judge, I am compelled to remark, that if at the same time the law had laid its interdiction upon all human intercourse as to exchanges *546 or purchases of property, the same result would have been produced, and with about equal justice and propriety. If fifty years ago, the law had laid aside its metaphysical subtleties, and revealed itself in its own simplicity and purity—if it had, regardless of form, pronounced appropriate judgments upon honesty and fraud, it would have won more by its justice than it has ter, rifled by its power. There cannot well be two standards of truth and morals—the one for courts of justice and another for the people in their ordinary intercourse. If by the inquisitions of the judicial crucible, a transaction both honest and fair may be alloyedjuntil it is dishonest and fraudulent, by the inverse power of transmutation, a fraud may be refined until it is equivalent to honesty and truth. If truth may become constructive falsehood, by the same rule falsehood may become constructive truth. If the possession of personal chattels is, or ought to be, conclusive evidence of ownership, it is also, or ought to be, conclusive evidence that a person not in possession is not the owner. All, then, that remains for the fraudulent debtor to do, who would conclusively place his chattels beyond the reach of execution, is to place them in the possession of his friend against whom no process has been issued, and it is done.
It was said by counsel upon the argument of this cause that the rule contended for by the appellants would tend to produce and encourage litigation and multiply suits, and for this reason would be upheld by the legal profession; that its adoption would tend to make expense and delay in the collection of debts, while the reverse would be productive of much utility and economy. It may be said with equal propriety that if our system of jurisprudence was exchanged for the arbitrary laws of the east; if our courts and juries were dispensed with, and justice measured out by the nod of the lawgiver, and executed by the bastón and bowstring, our administration of justice would be more summary as well as more economical, and the services of the legal profession might be altogether dispensed with.
This being an appeal from chancery, it is our duty asa court of equity, to pass upon both the law and the fact. The law has been *547 already discussed, and although leaving the goods in the possession of Stoddard was conclusive evidence of fraud until explained | when it was explained it was so no longer. I repeat, I am disposed to regard the bonafides of the transaction as abundantly proved by the pleadings, or rather by the answrnr, which is evidence. It is fully established that the assignment was not made for the purpose or with the intent to hinder or defraud creditors, but in payment of an actual debt, and that the property was left wdth Stoddard as the agent of Thurber and Townsend for the sole purpose of closing up the business for their benefit, without disguise or concealment. This, in my judgment, ought to satisfy a jury of the fairness and honesty of the transaction, and that the assignment was not made for the purpose or with the intent to hinder or defraud creditors, which under the view I have taken is all that is necessary. I discover nothing in this matter at war with law, equity or good morals 31 am, therefore, for reversing the decree of his honor the chancellor, and of affirming the decree of the vice-chancellor of the fifth circuit.
By Senator Vekplanck.
The history of our law respecting the rights of creditors in relation to the property of their debtor, sold, assigned or mortgaged by him, but remaining in his possession and under his control, is remarkable. It presents a perpetual struggle between a general rule of policy, intended to cut off the possibility of fraudulent or collusive sales, prescribing either legislatively or judicially that every sale, assignment dr mortgage, unaccompanied by change of possession, should be held fraudulent in the eye of the law, and void against creditors 3 and on the other side, the obvious hardship and injustice of numerous particular cases where the innocent and even benevolent intention of the party wras manifest, and the legal presumption of fraud appeared inequitable, oppressive, contrary to the truth of the case, and the moral feelings of those who must apply and enforce the law. Thus it happened here and in England, that whilst the courts and the books laid down the rule broadly, and often applied it strictly, that “unlesspossession accompanies and *548 follows the deed, it is fraudulent and void,” (in the words of Justice Buller, Edwards v. Harben, 2 T. R. 587, adopted and incorporated in our own statute,) yet first, case after case, and then class after class of exceptions was exempted from the rule, until' with us there were no less than twenty-four distinct grounds of exemption ; such as the kind of sale, purchase under execution, or distress for rent, necessity, convenience, the custom of trade, the distance or situation of place, the relation of parties, motives of humanity or of friendship, and special circumstances of various kinds more or less definitely defined, all enumerated by Judge Cowen, 3 Cowen, 190.
In the revision of our own statute law, it was attempted to settle all these doubts and discrepancies by positive legislation and strict definition. Acco rdingly, the learned revisers, returning to the strict policy of the old law, and the doctrine laid down in Edwards v. Harben, recommended that u all sales or mortgages not accompanied by an immediate delivery, and followed by an actual and continued possession, should be void against the creditors of the vendor,” and this without any exception, and excluding all explanation. See Revisers’ Report, 3 R. S. 657, 2d ed. But the same considerations of natural equity which had so often induced courts to break in upon the legislative and judicial rules of legal policy, had again equal weight with the legislature, so that in adopting the section recommended by the revisors, they added at the end a clause of exception, enabling the person claiming under the sale or assignment, to rebut the legal presumption of fraudulent intention by positive evidence of the good faith of the transaction. It was accordingly enacted first, nearly in the strong and comprehensive language of the revisers, that every sale of goods and chattels, and every assignment by way of mortgage or security, u unless the same be accompanied by an immediate delivery, and be followed by an actual and continued change of possession, shall be pronounced to be fraudulent and void as against creditors or subsequent purchasers, and shall be conclusive evidence of fraud.” Then the legislature, of its own motion, added the excepting and *549 qualifying clause^ “ unless it shall be made to appear on the part of the person claiming under such sale or assignment, that the same .was made in good faith, and Avithout any intent to defraud such creditors or purchasers.” This question of fraudulent intent, a subsequent section enacts, shall be a question of fact, and not of law; which is a legislative declaration of what has of late been judicially held to be the sound law. These enactments were thought to have settled the law conclusively, and so they appear to have been considered by Chancellor Kent,in his Commentaries, who, after giving the history of the fluctuations of legal decision, adds, “ The New-York Revised Statutes have put this vexed question at rest, as to the effect of non-delivery on sale or assignment. 2 Kent's Comm. 529. But this legislation has merely afforded a new and remarkable proof of the imperfection of human language, and the impossibility of definitely settling any great rule of law for the complicated affairs of human life, merely by the general language of a statute, or the provisions of a code.
The volumes of our reports, and still more, the actual litigation of our inferior courts, and the doubts and difficulties of men of business, as well as of their professional advisers, give ample demonstration that the law, clearly as it would seem to be enacted, is still fluctuating and doubtful. The decisions in this state since the statute of 1830, have, it seems to me, been more in the spirit of the learned revisers than in that of the enacting sovereign power. They have, I think, gone to lay down legal rules, necessarily general and artificial, to govern the decision of the particular question of intent" which is expressly declared to be one of fact; and they have tended to confine the qualifying and excepting clause of the statute, allowing exculpatory evidence, to the narrow limits of absolute necessity of continued possession. As between the official revisers and the revising legislature, this was an open question. The revisers were induced by considerations of public policy, to propose a strict and undeviating universal rule, which would exclude all possible fraud, even at the expense of occasional hardship and severity *550 towards innocent parties. The legislature endeavored to adopt that rule with such a modification as might prevent its hard and inequitable operation in special cases. Weighty arguments and high judicial authorities might be urged for either view of the question. But these are no longer applicable. It is not the question of legislative policy that the courts have now to examine, but that of pure statutory interpretation. Upon this, the older-decisions may throw some light; but the history of the enactment itself is a surer guide to the meaning of the legislature, if indeed it has not been clearly expressed in the language of the statute. As the decisions on the statute of 1830, are all recent, not yet wrought into the body of our law, nor familiar to the knowledge and practice of men of business, and as none of them have been made or adopted in this appellate court, I shall not consider them in detail, but am satisfied to consider the subject as res integra here, and to examine the statute as it stands in the books, without considering the late decisions of our own courts as of binding force, and regarding the older ones as important, chiefly as they point out the intention and explain the language of the statute.
The language of the statute has something of contradiction, indicating the double parentage of the two portions of the section, and this may explain the fact of the very different interpretation given to it by learned judges from that of the mass of business men who are to be governed by it. The absence of a change of possession, it is said,£< shall be presumed fraudulent, and to be conclusive evidence of fraud.” Now a conclusive presumption is defined to be, ££ a legal rule not to be overcome by any evidence that the fact is otherwise ;” like the presumption of payment, for instance, under our statute of limitation. No contradiction or explanation is admissible, or if admitted would be of any avail. It is the presumptio juris et de jure of the civilians which in their language, ££ probationem contrariam haud admittit;” and such was probably the meaning of the revisers. But as the law was actually enacted, it goes on expressly to allow that the only conclusive presumption in question may be *551 repelled by positive proof to the contrary. "The presumption of fraud, then, (although from-some of the language of our courts, I should think they viewed it otherwise,) must be considered only as a presumption of fact, a legal evidence of fraud, conclusive in the absence of contradictory testimony, but open to refutation. It is only, as Lord Mansfield defined the legal presumption of a grant raised by many years’ enjoyment, to be, “ such a presumption, that unless contradicted or explained, the jury ought to believe it.” Here the whole burden of proof is thrown upon the claimant under the sale, and he must “make it appear” that he acted in good faith. .1 think the words require that it shall not be a mere matter of inference that he did so act, but that he must give such external evidence of good faith in that transaction as its nature will admit. It is strictly under our statute a question of fact, such as a jury may judge of, and must alone do so, if the question comes before a court of common law; and any decision going to substitute an arbitrary rule of general policy or of legal presumption, to the evidence itself, must be unsound. If, then, there be positive evidence of a fair and full consideration paid, of the existence of reasonable motives for not requiring delivery, such as may and do sway honest men— for instance, filial or parental or brotherly affection, or the convenience and usage of business, together with that publicity which excludes the idea of intended evasion of law, or holding out false credit—all the requisitions of the statute seem to me to be fully complied with, in the strictest agreement with its letter, and in perfect conformity with its spirit, intention and policy.
In the present case, Thurber & Townsend, merchants of Utica, received from Stoddard, a village retailer in another county, who vyas indebted to them, an assignment of the remnants of his goods, and of numerous small outstanding debts due him, of two dollars and upward, “ for. and towards the payment and satisfaction of said debt.” Stoddard was left in possession as an agent to sell the goods, and collect the debts for the benefit of the assignees, for which he was to receive a reasonable compensation. The question now is, whether the assignment he void against a *552 ' subsequent judgment creditor. If it be so, it must either be from the presumption of fraud declared by the statute, or from the excess of value of the goods and debts assigned above the actual amount of the debt due, giving proof of an actual fraudulent intent. The chancellor has decided against the validity of the assignment on both grounds. The vice chancellor, who first heard the case, thought otherwise. I agree with his view of the value of the assigned assets ; $1200 of debts, more than one-fourth confessedly bad, another part doubtful, and the rest scattered among an hundred individuals or more, about a thinly settled country, some probably subject to set offs, all requiring some trouble and delay, many some actual expense in collecting ; together with $430 worth of goods, the refuse of an old stock valued at cost, not at New-York, but at prices at a secondary neighboring market, and goods too which would scarcely bear the expense of transporting to a place where they might be sold with less trouble and delay, might well be considered as hardly an equivalent to discharge a cash debt of $635. I assent to all the reasoning of the vice chancellor on this point as conclusive. Besides the offer of the appellants before suit to give up the property on payment of the debt, which was rejected, shows the estimate placed' by all parties on the property assigned. On' them, at least, it ought to be conclusive. Nor is the very trifling amount of goods sold and debts collected by the agent during three months, a slight additional circumstance to show the difficulty of realizing the assigned assets.
Secondly. As to the legal presumption of fraudulent intent prescribed by the" statute : I conceive the evidence of such intent arising from want of a change of possession to be repelled : 1. By the legality of the assignment per se for a bona fide debt, of assets of /doubtful value, though of a nominal amount, exceeding that of th'*e debt for which they were assigned. 2. By the strong proof of the publicity of the assignment, and of the employment of Stoddard as a mere agent, as appears in the cross-examination of the witnesses. Such publicity has always been held one of the strongest evidences of good faith, even from the time of Lord *553 Coke, who in Twyne’s casey when this principle of constructive fraudulent intent was first asserted, points out a secrecy as a mark of fraud, and publicity as the first precaution to be used in order to protect a honajide assignment in satisfaction of prior debts. 3. By the necessity of the case j the leaving the goods in Stoddard’s^ possession, and the debts to be collected by him, for a time, being apparently essential to the realizing of any considerable amount from them. An agent at Lowville was necessary, and he was probably the best.
From all these considerations, I think the appellants have given the external proof required by law to repel the presumption of fraud, and have made it appear “ that the transaction was in good faith, and without any intent to defraud creditors or purchasers.” I am therefore of opinion that the vice chancellor was correct in dismissing the complainants’ bill, and that the decree of the chancellor should be reversed.
Senator Young expressed his full concurrence in the views taken by the judges of the supreme court, who had just delivered opinions. He considered the question presented in this case as highly interesting, bringing under consideration what transfers shall be deemed fraudulent and what fair, not only in respect to creditors, but to the community at large, who may by false appearances be induced to part with their property, and then defrauded of their dues. He deemed the question important, also, in the view of public morals. He said, sympathy for the poor and unfortunate had been invoked, and the feelings of humanity appealed to, but he said it would be false sympathy and squeamish humanity to support, as legal, transactions like this, so well calculated for the perpetration of frauds. The case under consideration, he said, would not have stood the test of judicial enquiry as long since as 250 years ago, when Twyne’s case was decided. Then the proportion of personal in comparison with real property was small, commerce was limited, and imprisonment for debt allowed ; and yet in that case, in many respects, not more strongly marked with fraud than the present, the sale was ad *554 judged void. If such was the law then, surely it shouldnot now be relaxed, when so great a proportion of the prop erty of the country consists in personalty, and commercial transactions pervade the whole community, when imprisonment for debt is abolished, and even a certain portion of the debtor’s property is exempted from execution.. The extent of traffic in the country, and the state of the laws as between debtor and creditor, give facilities to the perpetration of frauds j and as those increase, the laws intended for the protection of the honest portion of the community should be more rigorously enforced. For these reasons, he was for an affirmance of the decree of the chancellor.
On the question being put, Shall this decree be reversed ? the members of the court divided as follows :
In the affirmative : Senators Dickinson, Furman, Hawkins, Hull, Hunt, Huntington, N. Johnson, Jones, Lee, H. A. Livingston, Nicholas, Verplanck—12.
In the negative : The President of the Senate, Mr. Justice Bronson, Mr. Justice Cowen, and Senators Edwards, Hunter, E. P. Livingston, Paige, Spraker, Sterling, Tallmadge, Wager, Young—12.
Whereupon the decree of the chancellor was affirmed.